IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL ANTHONY DAILEY,

          Plaintiff,

vs.                                                              No. CIV 08-538 MCA/LFG

ROBERT ULIBARRI, GILBERT GARCIA,
ELMER BUSTOS, JAMES THOMAS,
LEROY W. THOMPSON, and JONI BROWN,

          Defendants.

## MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION[1]

This is a *pro se, informa pauperis* civil rights action brought under 42 U.S.C. § 1983 by Plaintiff Michael Anthony Dailey ("Dailey").  Dailey was incarcerated at the Penitentiary of New Mexico ("PNM") at the time he filed his Complaint in June 2008.

### Claims and Defenses

Dailey states that he has a medical condition, Hepatitis C, requiring continued and indefinite treatment.  He alleges that Defendants refused to transfer him to an out-of-state facility where he could be housed in less restrictive conditions, because Defendants did not want to be billed for the higher cost of medical treatment in an out-of-state facility.  He says that the refusal to transfer him resulted in indefinite confinement at Level VI, the most restrictive level available, and this imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life, thus implicating a liberty interest.

Dailey also complains that Defendants are "not complying with treatment to cure Petitioner's

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

chronic illness Hepatitis C."

He seeks compensatory and punitive damages, and asks the Court to enter injunctive relief requiring Defendants to provide treatment for his chronic illness.

Plaintiff identifies the following Defendants in his Complaint:  Robert Ulibarri ("Ulibarri"), Warden at the Southern New Mexico Correctional Facility (SNMCF); Gilbert Garcia ("Garcia"), Classification Bureau Chief of the New Mexico Department of Corrections ("NMCD");[2] Elmer Bustos ("Bustos"), Director of Adult Prisons Division of the NMCD ;[3] James Thomas ("Thomas"), Unit Manager at SNMCF; LeRoy W. Thompson ("Thompson"), Unit Manager at PNM; and Joni Brown ("Brown"), Deputy Warden at PNM.

Other Defendants and claims were dismissed from the action by Memorandum Opinion and Order [Doc. 8], entered October 21, 2008.

All Defendants other than Garcia and Bustos were served with process and filed a joint Answer [Doc. 16] denying Plaintiff's allegations and asserting that their actions had a valid, rational connection to legitimate penological interests and were carried out in the good faith performance of their duties.  Defendants also assert affirmative defenses including, *inter alia*, failure to state a claim, failure of Plaintiff to affirmatively link the actions of the named Defendants to any constitutional violation, and qualified immunity.

The Court ordered Defendants to submit a <u>Martinez</u> report for purposes of developing the factual and legal basis of the claims.  *See*, <u>Martinez v. Aaron</u>, 570 F.2d 317, 320 (10th Cir. 1978). The parties were notified that the <u>Martinez</u> report and any response thereto may be used in deciding whether to grant summary judgment of Dailey's claims; therefore, they were further advised to submit whatever materials they considered relevant to the claims.

Defendants filed their <u>Martinez</u> report [Doc. 20], and Dailey filed a response [Doc. 34].  On August 10, 2009, the Court ordered Defendants to supplement the report; they did so on September

---

[2]Garcia retired from this position in December 2007. [Doc. 37, Ex. 8, at 1].

[3]Bustos retired from this position in September 2006. [Doc. 37, Ex. 10, at 1].

4, 2009 [Doc. 37].  In this supplemental report, Defendants Garcia and Bustos acknowledge in affidavits that they received adequate notice of this lawsuit and they state they are now represented by the same NMCD counsel who also represents the other Defendants herein.  Garcia and Bustos ask leave of Court to answer the allegations against them in the supplemental Martinez report.

The Court considers these statements to mean that Garcia and Bustos have entered their appearances.  Their Affidavits will be considered in the summary judgment determination. Defendant Bustos denies all of Plaintiff's allegations against him [Doc. 37, Ex. 10, at 2]; Defendant Garcia states that Plaintiff fails to allege any personal involvement on his part, and he also denies all allegations against him. [Doc. 37, Ex. 8, at 2].

Dailey filed a Response [Doc. 46] to the supplemental Martinez report on November 2, 2009.

## Factual and Procedural Background

Dailey began his period of incarceration on April 23, 2003.  He first arrived at the Reception and Diagnostic Center at Central New Mexico Correctional Facility ("CNMCF"), Los Lunas, New Mexico, where he spent 49 days undergoing the battery of evaluations given to all new inmates to determine their physical, mental, vocational and other status prior to classification and assignment to a specific institution.  [Doc. 37, Ex. 11, at 3; Ex. 12].

At the conclusion of this intake, NMCD placed Dailey in Level VI incarceration, the most restrictive level.  The reasons given for this placement included what Defendants describe as credible evidence that Dailey was a member of Los Carnales prison gang and that, while he was incarcerated at the Bernalillo County Detention Center,[4] Dailey admitted that he was directed by his gang hierarchy to murder another inmate.  He was initially assigned to PNM North, a Level VI facility.  [Doc. 37, Ex. 11, at 3-4, Ex. 12].

On June 13, 2003, Dailey was transferred to the Mental Health Treatment Center at CNMCF, as it was determined that he was in need of mental health treatment services not available at PNM.

---

[4]This facility is now known as the Metropolitan Detention Center and will be referred to herein as "MDC".

He was still a Level VI inmate.  On July 10, 2003, he was transferred to the Alternative Placement Area ("APA") at SNMCF at Las Cruces.  APA is a facility for housing Level V and Level V inmates identified to be in need of added mental health treatment.  NMCD policy states that "[p]lacement in the APA occurs in order to best facilitate mental health service delivery for such inmates."  Dailey remained in APA at SNMCF for over two and a half years until September 26, 2005 (except for a 15-day period in October 2003 when he was housed at MDC, apparently to attend hearings in his cases that were pending in Albuquerque).  [Doc 20, Ex. 3C, at 2; Doc. 37, Ex. 11, at 4, Ex. 12].

NMCD Classification Bureau Chief  Jeff Serna ("Serna") states in his Affidavit that the reason for Dailey's classification as a Level VI inmate changed in October 2004.  At that time, Serna says, credible evidence existed that Dailey's fellow Los Carnales gang members planned to "hit" or murder him; thus, he was placed in Level VI Protective Custody in order to protect his life. [Doc. 37, Ex. 11, at 4-5].

On September 26, 2005, Dailey was transferred to the APA at Central New Mexico Correctional Facility ("CNMCF"), remaining in Level VI Protective Custody status.  He remained there until March 6, 2006, when it was determined that he no longer needed mental health treatment services at APA and he was transferred back to PNM North, still in Level VI Protective Custody. [Doc. 37, Ex. 11, at 5, Ex. 12].

On April 27, 2005, Dailey filed a petition for habeas corpus in New Mexico state district court.  [*See*, Docket Sheet for Cause No. D-307-CV-200500702].[5]  On May 5, 2006, Judge Jerald A. Valentine, a state district court judge, held an evidentiary hearing on the petition. [Id.].

On May 8, 2006, Judge Valentine entered Findings of Fact and Conclusions of Law and Order to Show Cause, specifically finding that the Penitentiary refused to transfer Dailey to an out of state facility "because it anticipated being billed for medical expenses higher tha[n] the cost of

---

[5]Available at http://www.nmcourts.gov/.  "[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."  St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979).

providing the same medical treatment in New Mexico," and concluding that this refusal to transfer Dailey "solely to avoid the possibility of higher medical expenses imposes an atypical and significant hardship on [Dailey] in relation to the ordinary incidents of prison life." [Doc. 1, Ex. 4, at 3]. Judge Valentine concluded that "Michael Anthony Dailey has a liberty interest in avoiding the particular conditions of indefinite and protracted confinement in Level VI based solely on his involuntary protective custody," and he ordered the Respondent, Warden Ulibarri, to timely transfer Dailey to an appropriate out of state facility unless Respondent could show good cause for not doing so. [Id., at 4].

Ulibarri did not file an answer to the Order to Show Cause within the required ten days. On May 31, 2006, Judge Valentine ordered that Dailey be transferred out of state. [Doc. 1, Ex. 5].

For approximately the next seven weeks, Dailey was housed at PNM North while his transfer was pending. On June 22, 2006, Dailey was transferred to the custody of the Florida Corrections Department pursuant to Judge Valentine's order and was housed in corrections facilities in that state. He remained there until January 18, 2008. Serna states in his affidavit that, pursuant to the interstate compact governing such transfers, all issues regarding security classification and custody level of a particular inmate on out-of-state transfer are determined by the receiving state – in this case, the state of Florida. [Doc. 37, Ex. 11, at 5, Ex. 12].

On December 22, 2006, six months after he was transferred to Florida, Dailey filed a *pro se* document titled "Motion to Revamp Contract" in his state habeas case, asking that he be transferred back to New Mexico. On July 17, 2007, the court denied the "Motion to Revamp." [Docket Sheet for Cause No. D-307-CV-200500702].

On January 18, 2008, Dailey returned from Florida back into the custody of NMCD in order to serve the last six months of his New Mexico sentence and allow parole authorities time to prepare him for release. Serna states that upon an inmate's return from out of state, it is standard procedure for NMCD to re-evaluate the inmate's classification level. NMCD determined that there still existed a credible threat against Dailey's life from his gang or former gang, Los Carnales, and he was

retained at Level VI protective custody status during those six months.  Dailey filed this lawsuit on June 3, 2008.

On June 27, 2008, Dailey was released from incarceration into the supervision of NMCD Adult Probation and Parole Division.  Ten months later, on April 30, 2009, Dailey absconded from supervision.  He was arrested on July 2, 2009.  On July 7, 2009, he was incarcerated at CNMCF [Doc. 37, Ex. 11, at 5-6, Ex. 12], and on September 24, 2009, was moved back to PNM. [Doc. 40].

**Discussion**

The Court recommends that summary judgment be granted in favor of Defendants on all claims in Dailey's complaint.  This recommendation is based on findings that collateral estoppel is not applicable in this case; that Defendants are entitled to qualified immunity as to Dailey's claim of a due process violation by prolonged confinement in a restrictive prison classification; and that Dailey fails to establish an Eighth Amendment violation with respect to medical treatment while incarcerated.

*Collateral Estoppel Effect of State Court Ruling*

As noted above, New Mexico State District Judge Valentine ordered that Dailey be transferred out of state in 2006.  He found that Dailey had a liberty interest in avoiding indefinite and protracted confinement in Level VI, and that "the New Mexico Penitentiary," in refusing to transfer Dailey out of state solely to avoid the possibility of higher medical expenses, imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life.  Judge Valentine did not make a finding that any particular individual was responsible for depriving Dailey of his constitutional rights; rather, he referred to "the Penitentiary" as the responsible entity.

The Fourteenth Amendment provides that no state shall deprive any person of life, liberty, or property without due process of law.  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005).  The extent of due process protection for prisoners is significantly less than that guaranteed to free

6

persons.  <u>Estate of DiMarco v. Wyo. Dep't of Corr.</u>, 473 F.3d 1334, 1339 (10th Cir. 2007), *citing*
<u>Wolff v. McDonnell</u>, 418 U.S. 539, 555-57 (1974).

For inmates in state prisons, "the Constitution itself does not give rise to a liberty interest in
avoiding transfer to more adverse conditions of confinement," although "a liberty interest in
avoiding particular conditions of confinement may arise from state policies or regulations."  <u>Estate
of DiMarco</u>, at 1339, *citing* <u>Wilkinson v. Austin</u>, at 221.

> States may under certain circumstances create liberty interests which
> are protected by the Due Process Clause . . . .  But these interests will
> be generally limited to freedom from restraint which, while not
> exceeding the sentence in such an unexpected manner as to give rise
> to protection by the Due Process Clause of its own force, nonetheless
> imposes atypical and significant hardship on the inmate in relation to
> the ordinary incidents of prison life.

<u>Sandin v. Conner</u>, 515 U.S. 472, 483-84 (1995) (internal citations omitted).

Judge Valentine, of the state district court, found that Dailey's constitutional right to liberty
was violated under the standard set forth in <u>Sandin v. Conner</u>.  Because Dailey now brings this
federal lawsuit under § 1983, seeking damages for alleged violations of his constitutional rights, the
Court must determine whether the state court ruling has collateral estoppel effect in this case.

The doctrines of *res judicata* and collateral estoppel relieve parties of the cost and burden
of multiple lawsuits, conserve judicial resources and prevent inconsistent decisions.  <u>Allen v.
McCurry</u>, 449 U.S. 90, 94 (1980).

> Under the doctrine of res judicata, a judgment on the merits in a prior
> suit bars a second suit involving the same parties or their privies
> based on the same cause of action. Under the doctrine of collateral
> estoppel, on the other hand, the second action is upon a different
> cause of action and the judgment in the prior suit precludes
> relitigation of issues actually litigated and necessary to the outcome
> of the first action.

<u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 n.5 (1979).

The Supreme Court held in <u>Allen v. McCurry</u> that the doctrine of collateral estoppel is
applicable in actions under § 1983.  It further held that the doctrine is appropriately invoked by
federal courts faced with prior decisions of state courts:

> The federal courts generally have also consistently accorded preclusive effect to issues decided by state courts . . . .  Thus, res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system.  *See*, Younger v. Harris, 401 U.S. 37, 43-45 [(1971)] . . . . [There is] no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court.

Id., 449 U.S. at 95-96, 104.

*See also*, Brown v. DeLayo, 498 F.2d 1173, 1175 (10th Cir. 1974) ("A prior state court adjudication of a federal constitutional right bars a subsequent federal action seeking vindication of the same right").

It should be noted that both Brown v. DeLayo and Allen v. McCurry involved "defensive" collateral estoppel; that is, the situation when a defendant asserts a prior state court ruling in favor of the defense.  The instant case involves the issue of "offensive" collateral estoppel, in that Dailey seeks to rely on a prior state court ruling in his favor and to preclude the current defendants from challenging Judge Valentine's prior findings and conclusions.

In determining whether collateral estoppel precludes re-litigation in a § 1983 action  of an issue decided in an earlier state court proceeding, the federal court must apply 28 U.S.C. § 1738, which provides that judicial proceedings of state courts shall have the same full faith and credit in federal court "as they have by law or usage in the courts of such State . . . ."  As the Supreme Court noted in Allen:

> though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress [in 28 U.S.C. § 1738] has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.

Allen v. McCurry, at 96.

Because of this principle, the application of collateral estoppel in this case is to be determined by reference to New Mexico law.  Haring v. Prosise, 462 U.S. 306, 313 (1983); Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 80-81 (1984); Vance v. Utah, 744 F.2d 750,

8

752 (10th Cir. 1984).  However, the New Mexico Supreme Court notes that the federal and state standards for *res judicata* and collateral estoppel are "not divergent," <u>Deflon v. Sawyers</u>, 139 N.M. 637, 640, 137 P.3d 577 (2006); thus, while New Mexico law is controlling, it is appropriate to look to case law from the Tenth Circuit as well.

The New Mexico Supreme Court holds that a party seeking to apply collateral estoppel must demonstrate four elements:  (1) that the party to be estopped was a party to the prior proceeding, or in privity with a party;[6] (2) the cause of action in the present case is different from the cause of action in the prior adjudication; (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation.  <u>Shovelin v. Central N.M. Elec. Coop., Inc.</u>, 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993).

Once those four elements are established, the court must also examine whether the party against whom estoppel is asserted had a "full and fair opportunity" to litigate the issue in the prior litigation.  <u>Shovelin</u>, 115 N.M. at 297.  As discussed below, this inquiry overlaps with the first element, *i.e.*, whether the party to be estopped was a party or in privity with a party in the prior proceeding.

In this case, it is clear that elements (3) and (4) are met, as the issue at stake here – whether Dailey's constitutional liberty rights were violated – was actually litigated in the state court action, and determination of that issue was necessary to the decision in that case.

Element (2) is less clear.  The question is whether the cause of action in the present case – a claim for money damages for violation of a constitutional right – is different from the cause of action in the state case, which sought to vindicate the same constitutional right but asked for different relief, *i.e.*, an injunction in the form of a habeas writ rather than money damages.

---

[6]More recent New Mexico case law clarifies that the first element includes not only the parties named in the prior proceeding, but also those in privity with them.  <u>Rosette, Inc. v. United States Dept. of the Interior</u>, 142 N.M. 717, 729, 169 P.3d 704, 716 (Ct. App. 2007) (using a formulation found in a Tenth Circuit case); <u>Ullrich v. Blanchard</u>, 142 N.M. 835, 839, 171 P.3d 774, 778 (Ct. App. 2007), *cert. granted*, 143 N.M. 156, 173 P.3d 763 (2007).

Although Dailey's action in state court was brought against the warden and labeled as a habeas petition, and it was treated as a habeas petition by the state court, it probably would not have been so treated if Dailey had brought the same claim in federal court. A habeas petition under 28 U.S.C. § 2254 constitutes a collateral attack on the validity of a conviction or sentence, and a habeas petition under 28 U.S.C. § 2241 challenges the execution rather than the validity of a sentence – that is, it challenges actions which affect the fact or duration of the petitioner's custody.

Neither of these forms of habeas petition can be used in federal court to challenge a prisoner's conditions of confinement; such a challenge can only be brought in a civil rights action under 42 U.S.C. § 1983. McIntosh v. United States Parole Comm'n, 115 F.3d 809, 811-12 (10th Cir. 1997).

> Prisoners who raise constitutional challenges to other prison decisions – including *transfers to administrative segregation*, exclusion from prison programs, or suspension of privileges, *e.g,* conditions of confinement, must proceed under Section 1983 or Bivens . . . . [A]n inmate may invoke Section 2241 to challenge a sovereign's authority to detain him under any circumstances, but . . . if a prisoner wishes to address a decision to place him in a particular facility or attack the conditions that result from such a placement, he must bring a civil rights action.

Boyce v. Ashcroft, 251 F.3d 911, 914, 917-18 (10th Cir. 2001) (emphasis added), *opinion vacated as moot,* 268 F.3d 953 (2001). *See also,* Woodruff v. Everett, 43 Fed. Appx. 244 (10th Cir. 2002), holding that a challenge to lock-down conditions, resulting in denial of access to various facilities and activities in prison, may be brought only as a civil rights action, not in a habeas petition.

In any event, the state court treated Dailey's petition as a habeas case. The state court action was brought against Dailey's warden and sought release from Level VI restrictions. Dailey did not seek money damages in that case. Thus, this Court will assume that this federal case is based on a different "cause of action" than that raised in the state case.

Element (1) is also debatable. In this case, the "parties to be estopped" include individual corrections officers, whereas the defendant in the state habeas case was the warden. The warden, Robert Ulibarri, is one of the defendants named in this action. However, none of the other named

defendants was a party to the habeas case, since a habeas petition can only be brought against the person having custody of the petitioner.

One federal district court held that offensive collateral estoppel was not appropriate in a situation similar to Dailey's, where an inmate, who had previously brought a successful habeas action under § 2254, later sued under § 1983, naming the warden along with other defendants. The court held that the warden did not have a full and fair opportunity to litigate the § 1983 claims, since he had "no incentive to litigate the issue because Peterson sought release from imprisonment through his habeas petition, and not damages through a § 1983 action." Peterson v. Tomaselli, No. 02 Civ.6352 RJH, 2004 WL 2211651, at *18 (S.D.N.Y. Sept. 30, 2004).

In another unreported decision, a federal district court in Nevada reached the same conclusion. In Hays v. Clark County, No. 2:07-cv-01395-LDG-PAL, 2008 WL 2372295 (D. Nev. June 6, 2008), a United States Magistrate Judge in a § 1983 case had under consideration a motion in limine seeking to preclude reference to the fact that the Plaintiff had been granted a writ of habeas corpus in an earlier federal case, on grounds he was factually innocent of the child molestation charges for which he served 14 years in prison. After the habeas ruling, Plaintiff Hays brought a suit for damages under § 1983.

The judge held that the individual defendants in the § 1983 action – that is, the state court prosecutor, the detective who investigated the case, the current and former public defenders, and a nurse who was a witness at the trial – were neither parties to the habeas action nor in privity with the respondents in that action, i.e., the prison warden and Director of the Department of Corrections. The judge found further that the § 1983 defendants did not have a full and fair opportunity to litigate the issues that were determined in the habeas case:

> The individual defendants here were not represented by counsel in the habeas corpus proceeding, and they had no ability to control the habeas corpus action being defended by the State Attorney General's Office on behalf of the State defendants. The individual defendants in this case also did not enjoy the procedural opportunities to conduct discovery that this civil litigation affords them.

Hays v. Clark County, at *13.

11

The judge in the <u>Hays</u> case noted that some of the § 1983 defendants had no direct or individual interest in the outcome of the habeas case and some of them were not even aware of the claim, made in the habeas action, that the petitioner's constitutional rights were violated.  As for the detective and prosecutor, the court noted that while they "certainly had some incentive to defend the validity of the underlying criminal conviction, they lacked the same incentive to defend themselves as they do in this civil case . . . . [T]heir interests in the habeas corpus proceeding were much less compelling and personal than the interests at stake in this civil case."  <u>Id.</u>, at *14.

The court further noted that there are due process limits to the concept of privity, citing <u>Parklane Hosiery</u>, 439 U.S. at 327; and <u>Richards v. Jefferson County</u>, 517 U.S. 793, 794 (1996):

> The court finds it would violate these defendants' due process rights to bind them to the final judgment in the habeas corpus proceeding to which they were not parties, nor in privity with the state habeas corpus respondents. These defendants did not have separate counsel and their civil interests were not represented by the State Attorney General's Office which was defending the validity of Hays' underlying criminal convictions. These defendants have not had the opportunity to present their evidence and arguments on the plaintiffs' claims and have not had a full and fair opportunity to defend themselves from allegations they violated the plaintiffs' civil rights. It would, therefore, be unfair to give issue preclusive effect to Chief Judge Hunt's order granting Hays' petition for writ of habeas corpus, and the court will not exercise its discretion to apply the doctrine of offensive collateral estoppel to them.

<u>Hays v. Clark County</u>, at *15.

The Tenth Circuit has decided somewhat similar cases, although they involve the collateral estoppel effect of rulings in prior state criminal, not habeas, proceedings.

In <u>Kinslow v. Ratzlaff</u>, 158 F.3d 1104 (10th Cir. 1998), the court held that a § 1983 plaintiff could not assert offensive collateral estoppel in a federal action against individual police officers, where a state court earlier dismissed a criminal proceeding for lack of probable cause to prosecute. The court noted that the defendant officers, who were sued in their individual capacities in the § 1983 action, were neither parties to the state criminal case nor in privity with the State, and their personal interests were not at stake in the criminal proceeding.

In <u>Morgan v. Gertz</u>, 166 F.3d 1307 (10th Cir. 1999), the Tenth Circuit again refused to permit

offensive collateral estoppel in a situation similar to <u>Kinslow</u>, where a state court in a criminal proceeding made a finding that a social worker and a police detective violated the defendant's constitutional rights by failing to preserve exculpatory evidence, resulting in a judgment of acquittal notwithstanding the jury's verdict.  The acquitted defendant then sued the social worker and defendant under § 1983, seeking damages.  The Tenth Circuit found that "the state court's determination in Morgan's criminal trial that defendants committed constitutional violations is not binding in this civil action as there is no privity between the parties." <u>Morgan</u>, at 1309.

In <u>Novitsky v. City of Aurora</u>, 491 F.3d 1244 (10th Cir. 2007), a § 1983 action against the police officers who arrested Novitsky, there was a ruling in the state criminal prosecution that the officers violated his Fourth Amendment rights by applying a "twist lock" to his arm during the arrest prior to ascertaining whether he was armed or dangerous.  A gun found in Novitsky's possession was suppressed, and the criminal charges were dismissed.  Novitsky later attempted to use this ruling as offensive collateral estoppel in the § 1983 action brought against the officers.  The Tenth Circuit cited <u>Morgan</u> and <u>Kinslow</u> in rejecting application of collateral estoppel in this circumstance, holding:

> a court's conclusion during a criminal prosecution that a law enforcement officer's conduct was unconstitutional is not afforded collateral estoppel effect in a subsequent civil case against the officer because there is no privity between the prosecution in the criminal case and the officer . . . .  Thus, Mr. Novitsky must establish anew that the officers violated his constitutional rights in this § 1983 action.

<u>Novitsky</u>, at 1252 n.2.

In the present case, it is possible that the corrections officers named in the present action were aware of the state habeas proceeding instituted by Dailey.  However, it is unclear that any corrections official including Warden Ulibarri, the one person named in the state proceeding, had much if any incentive to avoid an adverse ruling in that case.  Certainly, the warden would face no financial consequences in the habeas case.  Ulibarri did not file a response to Judge Valentine's Order to Show Cause.  In an affidavit included with Defendants' original <u>Martinez</u> report,

13

Classification Bureau Chief Jeff Serna ("Serna") states that he was "closely involved" with the earlier habeas proceedings.  He states further that:

> Respectfully, in my position as NMCD Classification Bureau Chief, I am unaware of any statutory requirement, federal or state, that requires this Department to transfer an inmate to another state, in the absence of a court order.  Pursuant to the relevant NMCD policy (CD-14300, Exhibit Nos. 3A-G), an inmate may request an interstate transfer, but transfers out-of-state are a privilege, not a right . . . .
>
> On the 6th of May, the State's Third Judicial Court, the Honorable Jerald Valentine Presiding, at Las Cruces, ordered the State, through its Office of the Attorney General, to show cause why an order should not issue to direct this Department to transfer the Inmate/Plaintiff to another place of incarceration out of state.  Upon issuance of this Order to Show Cause, I am aware that the Department, in consultation with the one state's attorney assigned to this matter, determined that there was no reason or basis to contest what Management determined to be a court order, i.e. the transfer of the inmate out of state.  Thus, the Department began the process to transfer the Inmate out of state, as soon as possible.

[Doc. 20, Ex. 1, at 3, 5].

Thus, although Ulibarri, the named habeas Respondent, failed to file an answer to the Order to Show Cause, it appears that prison officials interpreted the Order to Show Cause as a directive from the court to begin preparations to transfer Dailey out of state.  It is apparent that Ulibarri, and the other prison officials now named in this case, would have had a greater incentive to challenge an Order to Show Cause if it had been entered in the context of a lawsuit claiming they were personally involved in a violation of Dailey's constitutional rights and were therefore personally liable to him in money damages.

In addition, even if Dailey could meet the four required elements for collateral estoppel, the next step in the analysis is a determination whether the party against whom estoppel is asserted had a "full and fair opportunity" to litigate the issue in the prior litigation, or whether other factors exist which would prevent application of collateral estoppel.  Silva v. State, 106 N.M. 472, 474, 745 P.2d 380, 382 (1987).  This inquiry overlaps with the issue of privity discussed above.  The Silva court held that there would be no "full and fair opportunity" when the defendant had little incentive to defend vigorously in the first suit, or where the second action affords the defendant procedural

14

opportunities unavailable in the first action, which could easily have caused a different result in the first case had they been applicable there.  Id., 106 N.M. at 475, 476.

Other factors that could prevent application of collateral estoppel include a significant change in controlling facts or legal principles occurring or coming to light after the state court ruling, or "special circumstances" which warrant an exception to the normal rules of preclusion.  Montana v. United States, 440 U.S. 147, 155 (1979).  Dailey has pointed to no such special circumstances in this case.

The Court finds that the overlapping issues of privity and "full and fair opportunity" preclude any collateral estoppel effect in this case.  The incentives to defend the habeas case were less compelling than in this civil rights action.  Most of the Defendants named herein were not parties to the previous case and may have been unaware of Dailey's claims that their actions violated his constitutional rights.  None of the Defendants named herein was represented by counsel charged with responsibility for vindicating them, personally, against charges of unconstitutional behavior.  Indeed, under these circumstances, it would be an affront to due process principles to bind the present Defendants with Judge Valentine's earlier habeas ruling.

Thus, Dailey "must establish anew that the officers violated his constitutional rights in this § 1983 action," as in Novitsky, supra.

*Qualified Immunity With Respect to Due Process Claim*
*Involving Conditions and Duration of Confinement*

Defendants in this case have asserted qualified immunity. [Doc. 16, at 7].  When an individual defendant in a civil rights action raises qualified immunity and the Court is faced with determining whether summary judgment is appropriate, the plaintiff must satisfy a "heavy two-part burden" to overcome the defense.  Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995).  Plaintiff  must show not only that defendants violated his constitutional or statutory right, but also that the right in question was clearly established at the time of the defendant's conduct.  Cassady v. Goering, 567 F.3d 628, 634 (10th Cir. 2009).  The Court may, in its discretion, examine these two elements in whatever sequence it deems best in light of the circumstances of the particular case at

hand.  Pearson v. Callahan, — U.S. —, 129 S. Ct. 808, 818 (2009).

Even if Dailey could to establish – whether by collateral estoppel or by proving it anew – that defendant's actions violated a constitutional right, he still must show that the right alleged to be violated was clearly established at the time of the conduct at issue.  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  The inquiry into whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier v. Katz, 533 U.S. 194, 201 (2001), *overruled on other grounds*, Pearson v. Callahan, *supra*.  The question to be answered is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 202.

In order for the law to be "clearly established," there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.  Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992); Trigalet v. Young, 54 F.3d 645, 648 (10th Cir. 1995).  The prior case law need not address a situation factually identical to that of the present case, but it must "provide 'fair warning' that an officer's conduct would violate constitutional rights."  Marshall v. Columbia Lea Reg'l Hosp., 474 F.3d 733, 740 (10th Cir. 2007).

> It is the plaintiff's burden to convince the court that the law was clearly established. In doing so, the plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it.  Instead, the plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.  While the plaintiff need not show that the specific action at issue has previously been held unlawful, the alleged unlawfulness must be apparent in light of preexisting law. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  If the plaintiff is unable to demonstrate that the law allegedly violated was clearly established, the plaintiff is not allowed to proceed with the suit.

Hilliard v. City and County of Denver, 930 F.2d 1516, 1518 (10th Cir. 1991) (internal citations and punctuation omitted).

The issue raised in this case by the second prong of the qualified immunity test is whether

it was clearly established, between April 2003 and May 2006, that prison authorities violated Dailey's constitutional liberty rights by holding him in Level VI classification for a three-year period rather than transferring him to another state where he could be housed in less restrictive conditions, when their refusal to transfer was based on a desire to avoid higher out-of-state expenses of treating his medical condition.

It should be noted that, in his state habeas petition, Dailey did not request that he be transferred out of state.  Rather, his request was that he be released from the restrictions of Level VI and be placed in Level IV. [Doc. 1, Ex. B(3)-B(7)].  In his Response to Defendants' Martinez Report, Dailey states that he was seeking "to find a meaningful avenue out of level VI" and that he "only wanted a meaningful avenue out of 23 hour supermax lock down, not transferred to an out-of-state facility so far away from family and children that it made life difficult for Plaintiff to have contact." [Doc. 34, at 6].  However, he acknowledges that his "only relief was for the Court to order an out-of-state transfer" [Id.].  Defendants assert the same, noting there was nowhere outside of Level VI, but still within the state, where Dailey could be housed, due to the dangers posed by his involvement with prison gangs.  Thus, the issue is whether Defendants violated Dailey's liberty interest by not transferring him sooner, and by relying on financial considerations for their decision.[7]

It was clearly established at the time in question that a prisoner has no liberty interest in assignment to a particular prison facility or particular portion of a prison.  Montez v. McKinna, 208 F.3d 862, 866 (10th Cir. 2000).  Furthermore, state prisoners do not have a liberty interest arising

---

[7]Dailey was returned to New Mexico on January 18, 2008 and served the last six months of his sentence at PNM North in Level VI confinement.  He was brought back to New Mexico so that he could be prepared for his release on parole, which occurred on June 27, 2008.  At the time of his return, prison officials determined that a credible threat still existed against Dailey's life, and he was retained in Level VI.  As noted, Dailey was aware of the circumstances that necessitated his restrictive confinement and was also aware that he could be relieved of Level VI placement only by transfer out of state.  Nevertheless, while he was in Florida, he himself asked to be returned to New Mexico.  See, "Motion to Revamp Contract of Out-of-State Penal Institutional Transfer and Issue New Order to Transfer Petitioner Back to New Mexico Penitentiary and to Review Petitioner's Good Time and Award Petitioner Additional Good Time," filed in state district court by Dailey [Ex. to Doc. 37]. Thus, in addition to the reasons stated elsewhere in this opinion, the Court finds no constitutional violation with respect to the 2008 period of Dailey's incarceration.

directly from the Constitution in avoiding particular conditions of confinement.  <u>Wilkinson v. Austin</u>, at 221-22.  However, the law was also clear, between April 2003 and May 2006, that a liberty interest in conditions of confinement may arise from state policies or regulations, if the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Sandin v. Conner</u>, at 484.

It is not the language of the regulations regarding prison conditions, but the nature of the conditions themselves "in relation to the ordinary incidents of prison life," that create enforceable due process rights.  <u>Wilkinson v. Austin</u>, at 223.  The Court must compare the duration and degree of plaintiff's restrictions as compared with conditions imposed on other prisoners.  <u>Perkins v. Kansas Dep't of Corrections</u>, 165 F.3d 803, 809 (10th Cir. 1999).

During the period of Dailey's incarceration from 2003 to 2006, it would have been clear to a reasonable prison official that an inmate's stay in segregation would violate his constitutional rights if it were "atypical and significant" as compared with conditions faced by other prisoners.  The comparison must occur with respect to both the conditions of confinement, and the duration of the confinement.  However, exactly how the prison official was supposed to make this comparison was not entirely clear during the relevant period.

### 1. *Conditions of Confinement*

In <u>Gaines v. Stenseng</u>, 292 F.3d 1222 (10th Cir. 2002), the Tenth Circuit held that it was improper for the district court to dismiss a prisoner's action under 28 U.S.C. § 1915 based on a 75-day stay in segregation, when there was "a complete absence of evidence concerning whether the duration and conditions of the prisoner's confinement in disciplinary segregation is atypical and significant in relation to the ordinary incidents of prison life."  <u>Id.</u>, at 1224.

With respect to the "conditions" prong of this inquiry, however, the <u>Gaines</u> court did not clarify how this comparison is to be made.  At one point the court seemed to approve the approach of comparing the plaintiff's conditions with those imposed on other inmates in administrative segregation and protective custody; at another, it spoke of comparing conditions between inmates

inside and outside of disciplinary segregation, which could includes inmates in the general population.  Id., at 1225-1226.

Dailey's case arose not from disciplinary, but from administrative, segregation.  That is, he was not placed in Level VI for any infraction of prison regulations but because, at the outset of his prison term, prison officials were in possession of information regarding his status as a gang member, and later because he was identified as a potential gang victim.[8]  As late as 2007, it was still unclear whether a reasonable prison official trying to decide whether conditions in administrative segregation impose an "atypical and significant hardship" should compare them to the conditions of prisoners in the general population, or to conditions of other typical protective custody inmates.

In Estate of DiMarco v. Wyo. Dep't of Corrections, supra, at 1342, the Tenth Circuit noted in 2007 that "the baseline comparison question" was still open.  By that, the court meant the question of which group of prisoners should be the "baseline" against which conditions of inmates in administrative segregation should be compared.

In DiMarco, the court discussed the case of Jordan v. Fed. Bureau of Prisons, 191 Fed. Appx. 639 (10th Cir. 2006), which involved a five-year placement in administrative segregation:

> [w]e noted that our circuit, in analyzing whether segregation is

---

[8] Although Dailey denies that he was part of a gang, the Court finds that there is sufficient evidence to support that conclusion. See, Gwinn v. Awmiller, 354 F.3d 1211, 1219 (10th Cir. 2004), a case involving a procedural due process challenge to a prison disciplinary hearing, in which the court held, "in ascertaining whether a factfinder's decision in a prison disciplinary hearing is sufficiently supported by the evidence, a reviewing court need not undertake an 'examination of the entire record, independent assessment of witnesses' credibility or weighing of the evidence.  Instead, the relevant question is whether there is any evidence that could support the conclusion reached by the disciplinary board.'" While the placement decision regarding Dailey was not taken in the context of a disciplinary hearing, the same principle applies.

As an aside, the Court notes it was recently involved in a case, Mascarenas v. Tapia, et al., Civ. 07-1253 WJ/LFG, where a former member of the same gang was stabbed multiple times within minutes of being transferred to a facility and a pod populated by members of the gang.  As was the case with Dailey, the inmate denied gang membership.  St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may judicially notice its own records).  Prison officials need not accept an inmate's assertion that he is not involved with a gang when they have credible evidence indicating such involvement, and administrative segregation may be used as a protective tool for the inmate himself and others in the institution, including other inmates, correctional officers and prison employees.

> atypical and significant, has used inconsistent standards in applying
> a comparative baseline.  On one hand, we have looked to conditions
> in the same *type* of segregation, whether it be administrative or
> protected custody.  [*Citing* Gaines v. Stenseng, *supra*].  On the other
> hand, we have suggested an appropriate baseline is the condition of
> the *general* prison population.  Penrod v. Zavaras, 94 F.3d 1399,
> 1407 (10th Cir. 1996). [Emphasis in original].

DiMarco, at 1340.  The court went on to say that "the baseline comparison question lends itself to

several possible solutions"; the court then discussed those various possibilities and concluded that

"the answer lies somewhere between these choices . . . .  It makes sense to look at a few key factors,

none dispositive . . . ."  Id., at 1341-42.  This state of the law does not give clear direction to a prison

official trying to avoid constitutional violations.

     As to what, specifically, the conditions of Dailey's confinement were, he describes them as

follows:

> Before Plaintiff [here, Dailey is referring to himself] left the New
> Mexico Department of Corrections, Plaintiff was only allowed one
> day a week two hour no contact visits either through glass or by glass
> with diamond wire mesh.  Plaintiff's family and children were never
> allowed to touch Plaintiff at any time during said visits and is still
> unable to do so. The New Mexico Department of Corrections alleges
> that Plaintiff was placed into level VI for protective custody against
> other inmates, not his family and children.
>            ***
> During Plaintiff's entire incarceration at the New Mexico Department
> of Corrections, Plaintiff was not allowed to obtain an inmate job and
> earn money like other inmates even though Plaintiff held an excellent
> record of good time awards for six years because Plaintiff was held
> in level VI indefinitely.
>            ***
> Plaintiff asserts, Defendants, place yourself in involuntary protective
> custody for six years locked down in a tiny cell 23 hours a day, then
> taken maybe outside to a dog cage the same size for 1 hour of sun
> light recreation; shackled in leg irons and arm irons everywhere you
> go; on two hour visit per week looking through glass with your loved
> ones and not ever being able to touch them for six years; receiving
> your breakfast, lunch and dinner through a tiny sized port of entry of
> your door and eating by yourself; not being able to converse with a
> neighboring cell mate; restricted to a few letters and telephone calls
> a week . . . .

[Doc. 34, at 23-26].  Dailey says that he was also denied medical treatment, ignored by the guards

when requesting a grievance form and given only limited access to educational services.  [Id.].

In the Order for <u>Martinez</u> Report, Defendants were asked to "[d]escribe in detail, through affidavit statements or otherwise, what Level VI classification meant for Dailey." [Doc. 17, at 8]. In response to this question Defendants supplied the affidavit of Classification Bureau Chief Jeff Serna, who refers to copies of NMCD policy CD-143000, in various editions as amended during the relevant period. [Doc. 20, Exs. 1 and 2 and attachments thereto]. In his affidavit, Serna states:

> This is the policy which any inmate, to include the Plaintiff, would be required to adhere in the event that he is classified as a Level V or Level VI special management inmate and so incarcerated in a Level V or Level VI facility. Further, I can attest that the Department has consistently adhered to this policy in its application to this class of inmates . . . [and] it has been consistent Department policy that issues regarding removal of an inmate from a general population setting to a special management unit (Level V or VI), placement in protective custody, etc., are governed by NMCD policy CD-143000.

[Doc. 20, Ex. 1, at 2].

Policy CD-143000 describes the conditions of inmates in the most restrictive classifications, including Level VI. Inmates are placed in Level VI for various reasons, including the fact that "housing in general population would place the inmate in jeopardy of serious bodily harm," and when separation from the general population is necessary because the inmate's "continued presence in the general population represents a threat to the security of the institution or the inmate is in danger of bodily harm or other violent acts from himself/herself or other inmates." [Doc. 20, Ex. 3C, at 4].[9] Defendants cite both of these reasons for Dailey's placement in Level VI administrative segregation.

Shortly after his incarceration began, prison officials determined that Dailey was eligible for placement in the APA, a special unit designated for inmates with mental health needs beyond those of inmates in regular Level V or Level VI housing. He remained in the APA for approximately two and a half years.

---

[9]Defendants supplied several versions of Policy CD-143000, as the policy was amended several times during the period of Dailey's incarceration. The Court will cite to the version which was revised on February 8, 2006 [Doc. 20, Ex. 3C], the version in effect when Dailey began his incarceration. Any relevant differences between the versions will be noted herein, if necessary.

Policy requires that any inmate remaining in segregation for more than 30 days will be personally visited by a qualified mental health professional who is to interview the inmate and prepare a written report.  For inmates continuing in segregation beyond 30 days, the mental health assessment is to be made at least every three months, or more frequently if prescribed by the chief medical authority. [Id., at 7].  Policy requires further that a review of the status of inmates in administrative segregation and protective custody is to be conducted by the classification committee or Unit Management Team every seven days for the first two months, and at least every 30 days thereafter, and that inmates in segregation receive daily visits from the senior correctional supervisor and from a qualified health care official. [Id., at 8].

Inmates in segregation are to be provided prescribed medication, "clothing that is not degrading" and access to basic personal items for use in cells unless there is imminent danger that such items might be destroyed or used to induce self-injury.  They are to have the opportunity to shave and shower at least three times per week.   They are allowed opportunities for visitation "unless there are substantial reasons for withholding such privileges; allowed access to reading materials and legal materials; are to receive a minimum of one hour of exercise per day, outside their cells, five days a week; and are allowed telephone privileges.  Programs and services available to inmates in administrative segregation include education, commissary, library, counseling, religious, recreational program, and social services. [Id., at 8-10].

By policy, inmates in segregation are to receive laundry, barbering and hair care services, and are issued clothing, bedding and linen on the same basis as inmates in the general population. In addition, they are allowed to write and receive letters on the same basis as inmates in the general population. [Id., at 9].

Inmates in segregation participate in a Step System, described in the Policy as "[a] behavior-driven progressive incentive system consisting of steps that encourages appropriate behavior.  Step assignments are not classification steps, but are behavior-based decisions." [Id., at 3].  The criteria for a change in the step level is set forth in detail in the Policy CD-143002. [Doc. 20, Ex. 3C2].

The Level VI Table of Services, which is labeled Policy CD-143002.B, sets forth the increasing levels of property and services which an inmate can earn as he progresses successfully through the steps.  [Doc. 20, Ex. 3C3].  For example, an inmate may progress to a level where he can have a cassette tape player, with monthly cassette exchanges increasing in number as he goes up through the steps; he has the privilege of unlimited receipt of mail, although the number of letters he can have in his possession at any one time is limited and increases as he progresses through the steps; his visiting, telephone, canteen and library privileges increase through the steps; and his access to educational and work programs expands as well. [Id.].

Policy CD-143005 [Doc. 20, Ex. 3C4] details the programs, activities and services available to inmates at various steps within Levels V and VI.  That Policy also requires that the Area Classification Officer shall visit all areas daily in which inmates in Levels V and VI are housed, "and shall be available no less frequently than once per week, to help each inmate who desires assistance or information." [Id., at 11].  In addition, a qualified medical professional is required by Policy to conduct sick call daily in each Level V and VI living area, and must examine every inmate who so requests to determine whether medical care is required. [Id.].

As noted above, Classification Bureau Chief Serna asserts that these Policies describe the living conditions to which Dailey was subjected during his incarceration in New Mexico facilities. Dailey's description of the conditions of his confinement in Level VI do not conflict with the Policies, except with respect to his allegation that he "was not allowed to obtain an inmate job and earn money like other inmates."

The Table of Services indicates, however, that Level VI inmates have an opportunity to work at a prison job "at discretion of Deputy Warden," once they reach Steps 4 and 5.  [Doc. 20, Ex. 3C3]. Dailey does not supply any information as to whether he ever sought prison employment, the reasons for any denial of a prison job, nor how his treatment with respect to employment was different from that of other inmates, in or out of administrative segregation.  The Court does not consider that any denial of prison employment worked an atypical or significant hardship on Dailey,

23

within the meaning of Sandin.  Nor did the other restrictions he faced violate his constitutional

rights.

> Hornsby alleged that he "has been segregated . . . for over 120 days,"
> and that inmates in the general population have greater access to the
> leisure and law libraries, "may immediately go on sick call," have
> greater job opportunities, and "are not given ice cream for not being
> violent" . . . .  We conclude that these disparities are not so onerous
> as to implicate due process protections. See Penrod v. Zavaras, [cited
> *supra*] (indicating that administrative segregation does not impose an
> atypical and significant hardship if it simply restricts privileges
> available to inmates in the general population).

Hornsby v. Jones, 188 Fed. Appx. 684, 688-89 (10th Cir. 2006).

In Villarreal v. Harrison, 1999 WL 1063830 (10th Cir. Nov. 23, 1999), a case involving a

two-year stay in administrative segregation, the Tenth Circuit noted:

> Villarreal alleges . . . that during his confinement in administrative
> detention his telephone privileges were restricted and he was required
> to eat all of his meals alone in his cell. We conclude that such
> allegations, even if true, do not establish that the conditions of
> Villarreal's administrative detention were so different as compared
> with normal incidents of prison life as to give rise to a protected
> liberty interest.  *See* Blum v. Federal Bureau of Prisons, 189 F.3d
> 477, 1999 WL 638232 at *3 (10th Cir.1999) (table) (rejecting
> argument that restrictions on store privileges, telephone calls, and
> access to a radio during disciplinary segregation were sufficient to
> create a protected liberty interest).

Id., at *2 n.1.

The Court finds that the conditions under which Dailey served his sentence in administrative

segregation were similar to those imposed on the plaintiffs in Hornsby and Villareal.  The

conditions, as described by the parties herein, were not so onerous as to constitute a violation of due

process.  A reasonable prison official in 2003 to 2006 would not have been on notice that placing

Dailey in Level VI for the reasons given, and subjecting him to the conditions set forth in the

Policies, would have constituted a violation of his liberty rights.

### 2. *Duration of Confinement*

The Court must also look at the duration of confinement in determining whether it was

clearly established, at the relevant time period, that keeping Dailey in administrative segregation for

a three-year period[10] was "atypical and significant."

The duration of Dailey's confinement in Level VI classification might have given prison officials pause, and duration was apparently the basis for Judge Valentine's ruling, along with his finding that prison officials were motivated by cost considerations.  However, this Court cannot say that it would have been clear to a reasonable prison official in 2003-2006 that it was unlawful to retain Dailey in the restrictive Level VI conditions, even for a three-year period, and even if the motive was to save money.

The Tenth Circuit in the DiMarco decision, *supra*, referred to a number of its unpublished opinions in which it upheld stays in administrative segregation of one year (Gutierrez v. Shanks, 1998 WL 380958 (10th Cir. July 9, 1998)); 399 days (Hill v. Fleming, 173 Fed. Appx. 664 (10th Cir. 2006)); 15 months (Jones v. Fields, 1996 WL 731240 (10th Cir. Dec. 20, 1996)); 584 days (Klein v. Coblentz, 1997 WL 767538 (10th Cir. Nov. 19, 1997)); 1000 days (Chappell v. McKune, 1999 WL 1079618 (10th Cir. Nov. 30, 1999)); and as long as five years (Jordan v. Fed. Bureau of Prisons, *supra*).

In Jordan, the case involving a five-year stay in segregation, the Tenth Circuit determined that the lengthy stay in administrative segregation did not create a liberty interest because the detention was reasonably related to legitimate penological interests and was necessary in light of the legitimate security concerns of the institution, and because the conditions in administrative segregation were not significantly different from those of the generally confined inmates.  In Hill v. Fleming, the court held that a stay of over one year in administrative segregation did not violate an established liberty interest, even though the conditions in segregation were generally inferior to those for the general population.  Both Jordan and Hill were decided in 2006.

In Hill, the Tenth Circuit held that "the established law at the time of Mr. Hill's confinement

_____

[10] Dailey was in Level VI for approximately a year and half, from April 2003 until October 2004 based on a finding that he represented a threat to prison security; and he was in Level VI for an another year and nine months based on the need to protect his life.

in 2001-2002 "would not put prison officials on notice of a liberty interest created by the type of deprivation presented, including the 399-day duration or other conditions of his confinement." Id., at 671-72.  The court made note of a number of mostly unpublished cases, within and without the circuit, upholding stays in administrative segregation of one year, two years, 15 months, and 582 days.  The Tenth Circuit also pointed to cases from other circuits upholding stays in administrative segregation for periods as long as 900 days.  Hill, at 670-71.

Thus, a reasonable prison official in 2003-2006 was not on clear notice that even a three-year-plus stay in administrative segregation would violate an inmate's liberty interests.  Respondents assert that, as transfer out of state is a privilege, not a right, their understanding at the relevant time was that the NMCD was not required to transfer an inmate to another state in the absence of a court order.  [Doc. 20, Ex. 1, at 3].

In addition, there is and was no clearly established law to the effect that prison officials violate an inmate's constitutional rights when they take into account the economic cost of acceding to an inmate's request for a change of administrative classification.  In the DiMarco case, which involved an inmate who was of ambiguous gender, the Tenth Circuit noted that Wyoming was a small state with no special facilities for transsexual inmates, and "[w]hile states now have the option of transferring prisoners to out-of-state facilities, the record in this case does not suggest that option was available to Wyoming, especially considering DiMarco's term of confinement and the cost of transfer."  Estate of DiMarco, at 1343.

This language indicates that cost is not a forbidden consideration; thus, a reasonable prison official does not necessarily violate an inmate's constitutional rights by taking cost into account in making decisions related to prison administration.  As the DiMarco court noted, "any assessment [of liberty interest in administrative classification] must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts."  Id., at 1342.

The Court finds that a reasonable prison official at the time in question could have chosen

the option of keeping Dailey at Level VI classification, even for a multi-year period, and that it would not have been clear to such an official that what he was doing violated Dailey's constitutional rights.

To summarize, it would not have been apparent to a reasonable prison official in 2003-2006 that Dailey's conditions of confinement in Level VI, nor the duration of that confinement, was extreme in relation to the ordinary incidents of prison life.  Thus, qualified immunity is appropriate for Defendants in this case.  "Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful."  Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007).

*Eighth Amendment Claim:*
*Failure to Provide Medical Treatment*

Dailey also asserts in his Complaint that NMCD "is not complying with treatment to cure Petitioner's cronic [sic] illness, Hepatitus [sic] C." [Doc. 1, at 12].  In his request for relief, Dailey asks for substantial compensatory and punitive damages.  He also seeks an injunction: "Most importantly to have the Medical Department give me the treatment for my chronic illness Hepatitus [sic]-C, 'Interferon.'" [Doc. 1, at 17].

At the time Defendants' Answer was filed, Dailey was out on parole.  Defendants contended in their Answer that a parolee has no right to free medical care or to free provision of medicine.  Dailey later violated the terms of his parole and was re-incarcerated.  In his Response to the Supplemental Martinez Report, Dailey alleges that the NMCD continues to refuse to provide him treatment for Hepatitis C.  [Doc. 46. at 1].

The Court construes this claim as one arising under the Eighth Amendment's proscription against cruel and unusual punishment.  Under certain conditions, denial or delay of treatment by prison medical personnel can constitute cruel and unusual punishment in violation of the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

> Prison officials violate the Eighth Amendment when they are
> deliberately indifferent to the serious medical needs of prisoners in
> their custody. A negligent failure to provide adequate medical care,

> even one constituting medical malpractice, does not give rise to a
> constitutional violation. Moreover, a prisoner who merely disagrees
> with a diagnosis or a prescribed course of treatment does not state a
> constitutional violation.

Perkins v. Kansas Dep't of Corrections, *supra*, at 811 (internal citations omitted).

The "deliberate indifference" standard has two components, one objective and one subjective; thus, Plaintiff must make a two-part showing: (1) that the medical need was "sufficiently serious," and (2) that the offending officials acted with a culpable state of mind, in that they must have known about the serious medical need and intentionally refused to provide medical care. Wilson v. Seiter, 501 U.S. 294 (1991); Farmer v. Brennan, 511 U.S. 825, 834 (1994).

A "serious" medical need is generally seen as one involving a life-threatening situation, or an instance in which it is apparent that delay would exacerbate the prisoner's medical problem, or could result in a lifelong handicap or a permanent loss. A delay in medical treatment does not violate a prisoner's constitutional rights unless he can show that the delay resulted in substantial harm. Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993); White v. Colorado, 82 F.3d 364, 366-67 (10th Cir. 1996).

"Intentional refusal" is more than a negligent diagnosis or an inadvertent failure to provide medical care; rather, the plaintiff must show a culpable state of mind on the part of the defendant, leading to an "unnecessary and wanton infliction of pain." Handy v. Price, 996 F.2d 1064, 1067 (10th Cir. 1993).

> [I]n the medical context, an inadvertent failure to provide adequate
> medical care cannot be said to constitute 'an unnecessary and wanton
> infliction of pain' or to be 'repugnant to the conscience of mankind.'
> Thus, a complaint that a physician has been negligent in diagnosing
> or treating a medical condition does not state a valid claim of medical
> mistreatment under the Eighth Amendment. Medical malpractice
> does not become a constitutional violation merely because the victim
> is a prisoner.

Estelle v. Gamble, 429 U.S. at 105-06. Dailey has not alleged the requisite culpable state of mind on the part of the Defendants, and he therefore fails to raise an issue of fact on the subjective element of the "deliberate indifference" test.

28

As part of the original <u>Martinez</u> Report, Defendants supplied the Affidavit of Stephen Vaughn, M.D., Health Service Bureau Chief for the NMCD. Dr. Vaughn reviewed Dailey's medical records but did not provide treatment to him and has no personal knowledge of Dailey outside of his medical records. [Doc. 20, Ex. 6, at ¶ 10].

Dr. Vaughn states that Dailey was diagnosed as positive for the Hepatitis C virus ("HCV") as indicated by blood test results of July 25, 2003. [Doc. 20, Ex. 6, at ¶ 18; Ex. 6E, at 2]. Dr. Vaughn further states persons with HCV may be treated with antiviral treatment, and that approximately 85% of such patients can attain a "cured" state. He says that it typically takes one year of treatment to attain a cure, that interruption of antiviral treatment to a period shorter than one year substantially lessens the likelihood of cure, and that a patient who has attempted but not achieved a cure cannot safely be treated again with antiviral treatment. [Doc. 20, Ex. 6, at ¶ 14].

As noted above, Dailey was given a blood test when he was first incarcerated, which indicated that he was positive for HCV. [Doc. 20, Ex. 6E]. A review of his medical chart in February 2004 resulted in a recommendation that he be referred to the chronic care clinic for management of HCV. [Doc. 20, Ex. 6I]. He was scheduled for an appointment in chronic care on April 12, 2004, but records indicate that he "refused" the appointment. [Doc. 20, Exs. 6J]. On July 13, 2004, a provider noted that Dailey had refused HCV chronic care treatment three times. The prison doctor then discontinued Dailey from the HCV chronic care program. [Doc. 20, Ex. 6M].

On April 27, 2005, Dailey returned to the chronic care clinic. The provider noted that Dailey had previously been discontinued from the HCV program for refusal to have his blood work done but that he was now requesting to get back on the chronic care list. The provider noted, "He understands that he needs to get up early in the morning for lab work and he agreed." The provider noted that lab tests would be done prior to Dailey's next appointment at the chronic care clinic, which would be in six months' time. [Doc. 20, Ex. 6N].

In June 2005, Dailey submitted a health service request form stating that although he is willing to have his blood drawn, the medical providers refused to schedule him for the lab work.

In response to this complaint, prison officials noted that Dailey was scheduled to be seen in October (six months after the April appointment) and that lab work would be done prior to this appointment. [Doc. 20, Ex. 6O].  In response to a second complaint from Dailey on June 27, 2005 that his blood work had not yet been done, Susan Stauffer, Health Services Administrator, wrote to Dailey on July 7, 2005, explaining:

> I checked your file again.  You are correct when you say your blood has not been drawn for Hep C this year.  This is because you missed 3 clinic appointments and were dropped from the clinic, per physician's order, in July 2004.  You were then returned to the clinic list, per your request, and saw the doctor in April 2005.
> The doctor's written orders to nursing, following your April appointment, were:
>
> > 1.  Do a CMP (blood test) before your next Hep C clinic appointment;
> > 2.  Schedule a follow-up clinic appointment in 6 months (which would be in October, 2005).
>
> Both appointments have been scheduled in October 2005, six (6) months after your April appointment.  The blood test is required to be taken prior, approximately one (1) week, to the next clinic appointment.
> The nurse cannot take your blood for the clinic test before October, per doctor's orders. Several of the nurses tell me that they have discussed this with you.  I hope this clarifies your expectations.

[Doc. 20, Ex. 6P].

There is no record of an October 2005 visit.  The next medical note on the record is dated December 6, 2005, when Dailey was seen at the chronic care clinic.  The provider noted that Daily was requesting the antiviral treatment at that time.  At this visit, Dailey was examined for other complaints, but the provider noted that Dailey "walked out mad before I could examine him further."  Lab work was ordered, and that Dailey was scheduled for an appointment in chronic care in six months' time.  [Doc. 20, Exs. 6R, 6S].  Lab tests were completed on December 12, 2005. [Doc. 20, Ex. 6T].

With his Response to the Martinez report, Dailey submitted a copy of a health service request form dated December 28, 2005.  This document was not included with Defendants' Martinez report.

In the request, Dailey stated that he completed the Addiction Services Program and now wanted to be put on the HCV treatment roster.  There is nothing written in the space for a response to the request.  [Doc. 34, Ex. E26].  Another document submitted by Dailey but not included with Defendants' <u>Martinez</u> report is a "sick call" note from Dailey dated May 30, 2006.  In this note, he again requests treatment for his HCV.  [Doc. 34, Ex. E30].  Further lab tests were done in early June, 2006. [Doc. 20, Exs. 6V, 6W4].

Dailey was transferred to Florida shortly after the June 2006 tests were done.  He returned to the New Mexico corrections system on January 18, 2008.[11]  The reason he was transferred back to New Mexico at that time was because his term of incarceration was due to end in June 2008.  Defendants assert that NMCD had to bring Dailey back into its custody for a period of six months prior to his release, in order to ensure that his parole plan was complete, that his residence and employment were verified, and that the New Mexico Parole Board had sufficient time to conduct a parole hearing.  [Doc. 16, at 3].

Between January and June 2008, Dailey continued to request lab tests and treatment for his HCV condition.  [Doc. 20, Exs. 7A-C, 7E-F].  On April 4, 2008, Dailey was seen at the chronic care clinic.  The provider noted that Dailey had a history of HCV and was requesting treatment.  The provider explained to Dailey that the antiviral treatment took a year to complete, and therefore NMCD could not provide it, as Dailey was scheduled to be released in June 2008. [Doc. 20, Ex. 7G].  Dr. Vaughn confirms in his affidavit that NMCD could not complete the HCV treatment regimen for Dailey upon his return from Florida, because there was insufficient time remaining on his sentence in which to complete the regimen.  He states further that this decision applied the usual and customary standard regarding treatment and length of sentence. [Doc. 20, Ex. 6, at 5].

Dailey continued to receive lab tests between April and June 2008.  He was seen in the chronic disease clinic on June 20, 2008, approximately one week prior to his release.  The provider

---

[11]Dailey complains of the medical care he received while incarcerated in Florida, but the Court will not consider these allegations as Florida corrections officials have never been named in this lawsuit nor served with process.

at that time found that Dailey's HCV was under "fair" control, that his clinical status had not changed, and that his HCV was not causing nausea, vomiting, abdominal pain or swelling, diarrhea, or lesions.  Lab tests were also done on June 20. [Doc. 20, Exs. 7H- 7N].  In his affidavit, Dr. Vaughn states that the lab tests done on Dailey on June 20, 2008 are standard tests that NMCD runs as necessary precursors to antiviral treatment of HCV.  He says that the tests indicate that at the time, immediately prior to Dailey's release, NMCD was actively seeking to determine his eligibility for antiviral treatment. [Doc. 20, Ex. 6, at 7].

Dr. Vaughn goes on to say that, at the time Dailey was paroled from NMCD custody, he was counseled on NMCD's inability to complete the one-year treatment regimen.  However, Dailey had the option of entering the ECHO ("Extension for Community Healthcare Outcomes") program, an HCV treatment program offered through the University of New Mexico Hospital ("UNM-H").  Dr. Vaughn describes ECHO as a state-funded program offered "through the largesse of the state legislature, and in partnership with UNM-H . . . that offers voluntary treatment to HCV-positive patients, regardless of their legal status." [Doc. 20, Ex. 6, at 5-6].

Dailey was released on parole on June 27, 2008.  He was arrested on a parole violation and re-incarcerated on July 2, 2009; thus, he was out of prison for over a year.  Dailey does not claim, and there is no indication on the record, that he attempted to receive treatment for HCV through the ECHO program during the period after his 2008 release and prior to his 2009 parole violation and re-incarceration.  Dailey included with his Response to the Martinez report several documents discussing the ECHO program [Doc. 34, Ex. E49]; thus, it is apparent that Dailey is aware of the availability of treatment through this program.

In his Response to the Supplemental Martinez report, Dailey states that after he was re-incarcerated, he continued to request HCV treatment from NMCD and the Department continued to refuse HCV treatment for him. [Doc. 46, at 1].

As noted above, the Court finds that Dailey has failed to show that Defendants were deliberately indifferent to his medical needs.  He was tested for HCV upon arrival into the custody

of NMCD, and New Mexico prison medical officials continued to conduct lab tests and to monitor his condition throughout his stay in their custody.  In early 2004, Dailey was referred to the chronic care clinic for treatment of his HCV.  After he missed appointments or refused treatments three times, he was dropped from the clinic.  Approximately nine months later, in April 2005, he returned to the clinic, and asked to be treated for the HCV.

The record is somewhat unclear on this point, but it appears that Dailey was scheduled for lab tests and HCV follow-up six months after the April 2005 visit.  Correspondence between Dailey and prison health officials indicates that he misunderstood the fact that he was expected to wait until October to be seen again in the chronic care clinic.  There is no indication on the record as to why his follow-up appointment was set for six months, although there is some mention of a requirement that he complete an addiction services program before receiving antiviral treatment.  At a clinic visit in December 2005, examination could not be completed because Dailey "walked out mad" before the examination was done.  He was rescheduled for a follow-up visit six months later.  At the time of the scheduled follow-up, he was transferred to Florida.

There is nothing to show that this period of delay had an adverse effect on Dailey's health, nor is there anything on the record to show that Dailey was a good candidate for the antiviral treatment.  One document submitted by Dailey along with his Response to the Martinez report states that inmates found to have deteriorating liver function would be referred to a treatment-review committee for a decision on whether HCV treatment is necessary. [Doc. 46, Ex. 49].  Dailey has not provided any indication that his liver function has deteriorated, nor has he provided the Court with any information as to his appearance before a treatment-review committee.  Other documentation supplied by Dailey indicates that a percentage of HCV infected people clear the virus out of their bodies naturally with no treatment at all, and furthermore that the treatment itself entails "brutal" side effects including nausea, vomiting and severe depression. [Id.].

Thus, it is not at all clear that the antiviral treatment requested by Dailey was necessary or appropriate for his particular situation.  In Arocho v. Nafzinger, No. 07-2603-REB-KLM, 2009 WL

179915, at *9 (D. Colo. Jan. 14, 2009), the district court noted that "Plaintiff's dispute centers around a difference of opinion on how his hepatitis C should be treated.  The question of whether a certain form of treatment should be prescribed is a classic example of a matter for medical judgment," *quoting* Estelle v. Gamble, 429 U.S. at 107 (internal punctuation omitted), and thus does not give rise to a cause of action under § 1983.

Similarly, the Tenth Circuit held in 1993 that an inmate's "quarrel with the doctor as to treatment for his hepatitis" failed to raise a constitutional issue.  Handy v. Price, *supra*, at 1067.  In Handy, the court relied in part on a doctor's testimony that there was no effective treatment for Hepatitis C at the time.  As indicated by Dr. Vaughn's affidavit, it appears that situation has changed in the intervening years.  However, there is still nothing on the record to establish that Dailey was a proper candidate for the currently available antiviral treatment, nor does he explain why he didn't seek out that treatment, through the ECHO program or elsewhere, when he was released from prison in 2008.

In 1997, the Tenth Circuit held that "[w]hile corrections authorities may, and probably will, develop guidelines regarding the use of interferon A for treating some [HCV-positive] inmates, neither the cited policies or regulations, or the absence of a policy, confers a constitutional right under the Fourteenth Amendment."  Bartlett v. Corr. Med. Svcs., Inc., No. 97-2160, 1997 WL 572834, at * (10th Cir. Sept. 16, 1997).

Ten years later, the Tenth Circuit upheld a district court ruling granting summary judgment for the defendants, holding that the plaintiff failed to establish deliberate indifference in a situation similar to that in Bartlett.  In Troutt v. Corr. Healthcare Mgmt., Inc., 248 Fed. Appx. 910 (10th Cir. 2007), the court noted that:

> Documents presented to the district court showed that treating Hepatitis C is not a matter of simply prescribing drugs.  Drug therapy can be dangerous and is often unnecessary . . . .  How to predict the outcome of chronic Hepatitis C infection in an individual case is not clear . . . .  Unfortunately there are no clear predictors of who is most likely to benefit from current treatments.
>   Currently available medication treatments for Hepatitis C infection are fraught with complications.  Side effects can be incapacitating,

> and even fatal.  In particular, persons with certain medical and mental health conditions are at high risk for fatal complications of the medications . . . .
>
> [A] report prepared by the Hepatitis C Support Project, states that "hepatitis C takes a long time to damage the liver[,] . . . many people will never get sick from hepatitis C," and "not everyone with hepatitis C needs to be treated with HCV medicines."

Id., at 912-13, 914.  The Court noted further that at one point in the plaintiff's confinement, "there could have been no assurance that he would be confined sufficiently long even to determine his suitability for drug therapy, much less provide such therapy," the same situation faced by Dailey when he returned from Florida.

Cases in district courts in the Tenth Circuit indicate a reluctance to hold prison officials liable for failure to provide treatment for HCV.  In Thomas v. Bruce, 428 F. Supp. 2d 1161 (D. Kan. 2006), the district court granted Defendants' motion for summary judgment in a case involving claims of failure to treat for HCV.  In so holding, the court noted that officials "clearly acknowledge that plaintiff had a serious condition that was continuously monitored through clinic visits and lab tests," that "care providers recognized plaintiff's condition and provided ongoing monitoring," and that "[t]he record indicates that plaintiff's reluctance to participate in a drug treatment program may have been partially responsible for his treatment delays."  Id., at 1170-71.

The record in Dailey's case indicates that he, too, was provided with continued monitoring and opportunities to participate in chronic care clinic but was reluctant at first to have his blood drawn and missed several clinic appointments.

In 2007, the Colorado district court held that Defendant prison authorities' failure to treat the plaintiff for HCV with antiviral interferon did not constitute deliberate indifference, noting that:

> First, it is clear that Plaintiff is receiving treatment for his conditions, even if it is not at a level that he desires.  He is being monitored and his symptoms are addressed to some extent.  Second, the protocol makes clear that antiviral treatment is not necessarily a cure; in fact, it states that "it must be noted that evidence-based medicine support for the efficacy of this treatment approach is lacking . . . . [S]uccess is not guaranteed and many categories of patients are ineligible for treatment because of drug use, previous illness, age, immune disorders, or decompensated liver disease . . . .  Plaintiff believes that this treatment would be effective for him; the medical providers do

35

> not.  Under controlling Tenth Circuit law, this disagreement over the
> best course of treatment does not amount to deliberate indifference.

<u>Taylor v. Ortiz</u>, No. 05-cv-00574-WDM-MJW, 2007 WL 2746746, at *5 (D. Colo. Sept. 19, 2007).

The court in <u>Taylor</u> further held that even if the plaintiff could establish deliberate indifference, "the

right to receive an antiviral therapy with an undetermined probability of success is not clearly

established"; thus, defendants in that case were entitled to qualified immunity.  <u>Id.</u>.

The Court finds the above cases analogous to the present case and persuasive on the issue

of deliberate indifference.  In addition, there is nothing on the record to connect any particular

Defendant to the alleged failures or delays in providing medical care.  No medical provider was

named as a Defendant herein, and Dailey fails to establish that the persons he does name were aware

of a serious risk of harm to Dailey from lack of antiviral treatment and personally took part in a

decision to deny him that treatment.

Defendants are entitled to summary judgment in their favor with respect to Dailey's

allegations of an Eighth Amendment violation in failing to provide him with the antiviral treatment

he requests.

## **Recommended Disposition**

That summary judgment be granted in favor of Defendants, that Plaintiff's complaint be

dismissed, and that this action be dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge